**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| ABAYOMI KALEJAIYE, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 19-02647 (RC) |
| | : | | |
| v. | : | Re Document No.: | 86, 87, 88 |
| | : | | |
| QUALITY INVESTIGATIONS, INC., | : | | |
| | : | | |
| Defendant. | : | | |

**<u>MEMORANDUM OPINION</u>**

**Granting in Part and Denying in Part Defendant's Motion for Summary
Judgment; Denying Plaintiff's Motion for Summary Judgment; and Granting in
Part and Denying in Part Plaintiff's Motion for Sanctions**

## I. INTRODUCTION

Before the Court are Quality Investigation, Inc.'s ("QI") Motion for Summary Judgment

("Def.'s Mot."), ECF. 86-1, and Abayomi Kalejaiye's Motion for Summary Judgment ("Pl.'s

Mot."), ECF No. 87-2.  Both QI and Kalejaiye filed memoranda in opposition to the respective

moving party's motion for summary judgment, ECF Nos. 90 and 92-2 ("Def.'s Opp." and "Pl.'s

Opp.," respectively).  Both parties also filed replies, ECF Nos. 93 and 94 ("Pl.'s Reply" and

"Def.'s Reply," respectively).  Additionally, Kalejaiye filed a Motion for Sanctions ("Sanctions

Mot."), ECF No. 88, to which QI filed an opposition ("Sanctions Opp."), ECF No. 91, and in

support of which Kalejaiye filed a reply, ("Sanctions Reply"), ECF No. 95.  For the foregoing

reasons, the Court grants in part and denies in part QI's motion for summary judgment, denies

Kalejaiye's motion for summary judgment, and grants in part and denies in part Kalejaiye's

motion for sanctions.

## II. FACTUAL BACKGROUND

Prior to its dissolution, QI contracted with the federal government to provide security officers at government facilities.  *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts at 1 ("Response to Undisputed Facts"), ECF No. 92-1.  As relevant here, QI contracted with the government to provide security officers at a Department of Transportation ("DOT") facility and a Department of Labor ("DOL") facility.  *Id.* at 1, 45.  Kalejaiye—Plaintiff in this case—was one of the officers that QI employed to staff its DOT facility contract.  *Id.* at 4.

When QI hired Kalejaiye, he had a beard.  *Id.* at 7.  Under QI's policies, QI employees were required to maintain certain grooming standards.  *Id.* at 46.  Specifically, QI employees were required to either (1) shave, (2) maintain a beard shorter than 1/4 of an inch with a medical waiver, or (3) receive an accommodation to grow their beard longer than 1/4 inch.  *Id.* at 5–6, 46.  Prior to beginning work at QI, Kalejaiye obtained a medical waiver permitting him to grow a beard of 1/4 inch in length, but after starting work with QI he requested a religious accommodation so that he could grow his beard longer.  *Id.* at 6–7.  QI's grooming policies ostensibly regulated beard length to ensure that security guards at the DOT facility could use gas masks effectively if the need arose.[1]  *Id.* at 4–6, 14.  The parties disagree about what precisely happened next.

QI points to evidence showing that its contract with DOT required it to obtain DOT's approval before it could grant a religious accommodation allowing Kalejaiye to grow his beard beyond 1/4 inch.  *Id.* at 11-12, 18, 26–27, 30–31.  And QI points to evidence showing that it took Kalejaiye's request to DOT and that DOT denied the request.  *Id.* at 19, 25, 31.  Kalejaiye rejects

---

[1]  The record reflects that maintaining a beard over a certain length—though the precise length is disputed—can cause an employee difficulty in creating an airtight seal with a gas mask, causing the gas mask to be ineffective.  *See* Response to Undisputed Facts at 15–16, 20, 24.

these contentions.  Specifically, Kalejaiye's proffered evidence shows that QI was obligated to grant his accommodation request in the first instance and that DOT could review that decision subsequently.  *Id.* at 25–27, 30–31.  Additionally, Kalejaiye points to evidence calling into question whether QI ever presented his accommodation request to DOT.  *Id.* at 25.

The parties also dispute whether QI considered transferring Kalejaiye to its DOL facility contract—where Kalejaiye asserts gas masks were not required—as an accommodation for Kalejaiye's religious practice of beard growth.  *Id.* at 39–41.  QI presents evidence that it considered the possibility of transferring Kalejaiye but determined that it had no vacant positions at the DOL site, that reassignment was impracticable, and that Kalejaiye would still be required to shave his beard to 1/4 inch even if reassigned to the DOL site.  *Id.* at 39–44.  Kalejaiye disagrees.  Kalejaiye points to contradicting evidence suggesting that QI did not seriously consider moving him to its DOL contract.  *Id.* at 39–44.

The parties do not dispute that QI eventually informed Kalejaiye that DOT would not permit an accommodation and that if Kalejaiye did not shave his beard to 1/4 inch or shorter he would not be allowed to work on the DOT contract.  *Id.* at 7, 28, 37.  Kalejaiye did not shave his beard and, consequently, QI eventually removed him from the security guard rotation at the DOT facility.  *Id.* at 27–28, 38.  In June of 2018, Kalejaiye filed a charge of discrimination with the Equal Employment Opportunity Commission alleging religious discrimination under Title VII and in July of 2019 the EEOC issued Kalejaiye a notice of his right to sue.  *Id.* at 38; Complaint at 2 ("Compl."), ECF No. 1.

At some point before April of 2019, QI lost its security guard contract with the federal government.  *See* Response to Undisputed Facts at 49.  After QI lost its contract, the new contractor replacing QI held a job fair for security officers who worked at the DOT facility.  *Id.*

at 49–50.  The new contractor received a list of employees under the current contract from the government, presumably based on a list of employees provided to DOT by QI.  *Id.*  When the new contractor held a job fair for current employees—approximately nine months after Kalejaiye's last shift at the DOT facility—Kalejaiye's name was not included on the list of employees DOT provided to the new contractor.  *Id.*  QI relies on testimony that Kalejaiye was removed from the list because he was terminated from QI and removed from the DOT facility guard rotation prior to the job fair.  *Id.* at 49.  Kalejaiye, by contrast, asserts that he was not informed of his termination until after the job fair.  *Id.* at 49–50.

In September of 2019, Kalejaiye sued QI for violations of Title VII of the Civil Rights Act of 1964, as well as common law tortious interference with prospective business advantage under District of Columbia common law.  *See* Compl. at 7–8.  After discovery, both QI and Kalejaiye moved for summary judgment and Kalejaiye moved for sanctions.  *See generally* Def.'s Mot.; Pl.'s Mot.; Sanctions Mot.  The Court addresses all three motions below.

### III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  And a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  On summary judgment, the Court views all evidence "in the light most favorable to the nonmoving party and the [C]ourt [ ] draw[s] all reasonable inferences in favor of the nonmoving party."  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

With respect to Kalejaiye's motion for discovery sanctions, the Federal Rules of Civil Procedure permit the Court to "order measures no greater than necessary to cure prejudice" arising from a party's "fail[ure] to take reasonable steps to preserve" electronically stored information that should have been preserved in anticipation of litigation.  Fed. R. Civ. P. 37(e).  Rule 37(e)(1) "does not place a burden of proving or disproving prejudice on one party or the other" and the "rule leaves judges with discretion to determine how best to assess prejudice in particular cases."  Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.

## IV.  ANALYSIS

### A.  Sanctions

Because the Court's resolution of Kalejaiye's motion for sanctions could impact the evidence the Court considers when deciding the parties' motions for summary judgment, the Court addresses Kalejaiye's request for sanctions before proceeding to the merits.  Kalejaiye's motion for sanctions requests relief under Federal Rule of Civil Procedure 37(e)(1) to cure the prejudice that Kalejaiye contends arises from QI's failure to preserve certain electronically stored information.  *See* Sanctions Mot. at 9.  In particular—and for reasons that will become clearer below—Kalejaiye requests that the Court preclude QI from arguing that: (1) QI did not have over 500 employees, (2) QI did not have space to hire Kalejaiye pursuant to its DOL contract, and (3) QI punished other security officers for violations of its grooming standards.  *See* Sanctions Mot. at 14, 18–19.  Kalejaiye "does not request sanctions pursuant to Rule 37(e)(2)." *Id.* at 9 n.8.[2]

---

[2] Rule 37(e)(2) sanctions are appropriate only where a "party acted with the intent to deprive another party of the information's use in the litigation," Fed. R. Civ. P. 37(e)(2), and "[t]he phrase 'intent to deprive' naturally requires that the spoliator has a 'purpose of hiding adverse evidence' from other parties."  *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1312 (11th Cir. 2023) (citation omitted).  Because Kalejaiye does not seek relief under

### 1.  Number of Employees

The Court begins with Kalejaiye's request that the Court preclude QI from arguing that QI had fewer than 500 employees.  Kalejaiye bases his motion on QI's failure to preserve records reflecting the number of its employees.  *See* Sanctions Mot. at 7, 11.  The D.C. Circuit has explained that the "duty to preserve documents . . . exists where litigation is reasonably foreseeable."  *Gerlich v. U.S. Dep't of Just.*, 711 F.3d 161, 170 (D.C. Cir. 2013).  "Once a court has determined that future litigation was reasonably foreseeable to the party who destroyed relevant records, the court must then assess . . . whether the destroyed records were likely relevant to the contested issue."  *Id.* at 171; *see Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 45 (D.D.C. 2019) ("Once a party anticipates litigation, it must preserve potentially relevant evidence that might be useful to an adversary.").  Thus, the Court must determine whether (1) "future litigation was reasonably foreseeable" to QI when it ceased preserving records reflecting its personnel count and (2) whether those records were "potentially relevant evidence that might be useful to" Kalejaiye.  *See Gerlich*, 711 F.3d at 170; *see also Borum*, 332 F.R.D. at 45.

The Court readily concludes that litigation was reasonably foreseeable when QI ceased preserving records reflecting the number of its employees.  It appears that QI lost access to the records that Kalejaiye seeks sometime in 2020.  *See* Sanctions Mot. at 3–4; Sanctions Opp. at 4 (stating that QI went out of business in February 2020); Sanctions Reply at 4 (stating that QI went out of business in July 2020).  A law firm retained to represent QI informed QI's human

---

Rule 37(e)(2) and there is no evidence that QI sought to hide records from Kalejaiye, the Court must ensure that any curative measures it may order "do not have the effect of measures that are permitted [only] under subdivision (e)(2)."  Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.  "An example of an inappropriate (e)(1) measure might be an order . . . precluding a party from offering any evidence in support of, the central or only claim or defense in the case."  *Id.*

resources contractor that it should institute a litigation hold on July 30, 2018. *See* Litigation Hold Letter, ECF No. 88-1. And Kalejaiye filed his complaint on September 4, 2019. *See generally* Compl. "At the very least, the duty [to preserve] begins no later than the date the lawsuit is filed." *Borum*, 332 F.R.D. at 45. There is no question that QI could reasonably foresee litigation when it ceased preserving records reflecting the number of its employees because litigation had already begun.

The Court also concludes that the number of QI's employees was "relevant to [a] contested issue." *Gerlich*, 711 F.3d at 171. This is so because the number of employees a company employs governs the compensatory damages cap in Title VII cases. *See* 42 U.S.C. § 1981a(b)(3). It is unreasonable that QI did not maintain some record—whether that be a company roster, tax forms, personnel files, or payroll documents—that would permit Plaintiff to determine the number of employees employed by QI. The fact that QI closed its business does not completely absolve it of the responsibility to maintain relevant documents because parties have a continuing responsibility to take reasonable steps to preserve electronically stored information ("ESI"). *See* Fed. R. Civ. P. 37(e) (applicable when "a party failed to take reasonable steps to preserve" ESI); Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment ("prospect of litigation may call for reasonable steps to preserve information *by intervening in [] routine [business] operation[s]*" (emphasis added)); *see Schulman v. Saloon Beverage, Inc.*, No. 2:13-CV-193, 2014 WL 1516326, at *6 (D. Vt. Apr. 18, 2014) (explaining that the "general observation that [defendant] went out of business" did not completely absolve defendant of responsibility to preserve ESI); *c.f., Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1400 (Fed. Cir. 2014) (sale of company did not absolve defendant of obligation to preserve records under record preservation statute). Although a party's resources may factor

into whether preservation efforts were reasonable, *see* Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment (explaining that "court should be sensitive to party resources"), a dearth of resources does not categorically exempt a party from its preservation obligations, *id.* ("A party may act reasonably by choosing a less costly form of information preservation, if it is substantially as effective as more costly forms. . . . A party urging that preservation requests are disproportionate may need to provide specifics about these matters in order to enable meaningful discussion of the appropriate preservation regime."); *C.f. hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 977, 979 (N.D. Cal. 2022) (awarding sanctions when company deleted ESI in an effort to reduce costs when company was "struggl[ing] financially" and "unable to pay the bills").  As Kalejaiye points out, QI had numerous low-cost options for storing information, *see* Sanctions Reply at 2, and QI—or its insurance carrier and counsel—could have utilized these options even considering the fact that QI was going out of business.  If companies could rid themselves of the obligation to preserve relevant ESI by dissolving, companies could dissolve and re-incorporate anytime they desired to deny a plaintiff access to ESI that would otherwise be discoverable.

For these reasons, the Court concludes that litigation was reasonably foreseeable when QI ceased preserving records reflecting the number of its employees, that the records were relevant to a contested issue, and that QI had an obligation to preserve the records.   The Court also concludes that Kalejaiye suffered prejudice resulting from the loss of the records because, without information on the number of QI's employees, Kalejaiye may be unable to demonstrate that a higher damages cap is applicable. [3]  *Borum*, 332 F.R.D. at 47 ("To show prejudice

---

[3] The compensatory damages cap issue becomes important only if a jury returns a verdict above the applicable cap (the parties appear to agree that the cap here is either $200,000 or $300,000, depending on the number of QI's employees).  *See* 42 U.S.C. § 1981a(b)(3); Sanctions

resulting from the spoliation, a party must only come forward with plausible, concrete

suggestions as to what the destroyed evidence might have been" and why that evidence would

have an impact on the "presentation of proof." (cleaned up) (citation omitted)).

### 2. Vacancy at DOL

The Court next considers Kalejaiye's request that the Court preclude QI from arguing

that it did not have a vacancy in which to employ Kalejaiye pursuant to its DOL contract. *See*

Sanctions Mot. at 18. In support of his motion, Kalejaiye contends that QI failed to retain

records that would have indicated how many employees QI had working pursuant to its DOL

contract so that Kalejaiye could determine whether there was capacity to hire him for that

contract. *Id.*

For the reasons explained above, the Court concludes that QI could reasonably foresee

litigation at the time it ceased preserving records reflecting the number of its personnel at the

DOL facility—indeed litigation had already commenced. The closer question is "whether the

destroyed records were likely relevant to the contested issue." *Gerlich*, 711 F.3d at 171.

Information is "relevant to the contested issue," *id.*, when it "bears on, [or could reasonably] lead

to other matter that could bear on, an[] issue that is *or may be in the case*," *Oppenheimer Fund,*

*Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (emphasis added).

---

Mot. at 11; Sanctions Opp. at 10. The Court is open to reconsidering this issue if QI produces
evidence that the $200,000 cap should apply. The Court will grant QI leave to make requests or
issue third-party subpoenas to third-party entities (*e.g.*, tax preparers; workers compensation
providers or insurers; local, state, or federal taxing authorities; payroll banks; payroll facilities,
etc.) at any point up to the deadline for motions in limine. Rule 37(e) is only applicable when lost
ESI is irretrievable from another source, including other custodians. *See* Fed. R. Civ. P. 37
advisory committee's note to 2015 amendment. It is reasonable to believe that some record still
exists regarding the number of QI's employees given that the Internal Revenue Service
recommends employers retain "records of employment taxes for at least 4 years," *see* Department
of the Treasury, (Circular E), Employer's Tax Guide 8 (2024), which includes the "[d]ates of
employment for each employee," *id.*

Neither Kalejaiye's EEOC Charge of Discrimination nor his complaint filed in this Court asserted that he should have been accommodated by transfer to the DOL cite.  *See generally* Charge of Discrimination, ECF No. 86-26; Compl.  And it appears that Kalejaiye only began seeking information about the possibility of transfer to the DOL site on May 25, 2021—after QI went out of business and ceased preserving some of its records.  *See* Sanctions Reply at 4; Sanctions Opp. at 15; Pl.'s Mot. to Compel Continued 30(b)(6) Deposition, ECF No. 38.  Thus, on one view, QI had no reason to believe that the DOL records "were likely relevant" to the issues presented by Kalejaiye when it failed to preserve those records.  *Gerlich*, 711 F.3d at 171; *c.f. Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) ("[F]ailure to document events that might prove relevant to unforeseen litigation and to retain those records indefinitely does not amount to spoliation.").  But that view does not capture the full picture.

Kalejaiye's EEOC charge generally asserted that QI failed to accommodate his religious practice.  *See* Charge of Discrimination.  And QI concedes that it considered transferring Kalejaiye to its DOL contract as a religious accommodation.  *See* Def's Mot. at 25–26; Def.'s Rely at 12; Lane Dep., Ex, 4 at 33-35, 36, ECF No. 86-5; Ricks Dep. at 29, ECF No. 87-9. Consequently, QI had reason to know that the possibility of reassignment could become a contested issue in the course of Kalejaiye's accommodation litigation.  In other words, information about the possibility of reassignment "bear[s] on . . . an[] issue that is or may be in the case."  *Oppenheimer Fund*, 437 U.S. at 351; *c.f. Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996) (reversing decision of district court, in ADA accommodation case, where district court refused to compel discovery on possibility of reassignment as an accommodation because reassignment was possible accommodation and relevant to plaintiff's claim); *see also* 29 C.F.R. § 1602.14 (2024) (requiring employers to "preserve all personnel records relevant to [a]

charge or action [for disability discrimination] until final disposition of the charge or the action"
and specifying that relevant personnel records "include personnel or employment records
relating to the aggrieved person and to all other employees *holding positions similar to that held
or sought by the aggrieved person*" (emphasis added)); *Sharma v. D.C.*, 65 F. Supp. 3d 108,
113–114 (D.D.C. 2014) (treating violation of 29 C.F.R. § 1602.14 as a failure to comply with
Federal Rule of Civil Procedure 37); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 109
(2d Cir. 2001) (superseded on other grounds) ("[W]here . . . a party has violated an EEOC
record-retention regulation, a violation of that regulation can amount to a breach of duty
necessary to justify a spoliation inference in an employment discrimination action."). QI's
failure to preserve records reflecting the number of its personnel at the DOL facility prejudiced
Kalejaiye because the lack of records prevents Kalejaiye from testing whether QI could have
accommodated him by means of transfer to the DOL facility. *See hiQ Labs*, 639 F. Supp. 3d at
979 ("Prejudice exists [in Rule 37(e)(1) context] where the spoiling party's actions impaired the
moving party's ability to go to trial or threatened to interfere with the rightful decision of the
case." (cleaned up)).

### 3.  Treatment of Other Officers

The same analysis is applicable to QI's failure to retain documents relating to whether QI
punished other security officers for violations of QI's grooming standards. Like the records
above, QI's disciplinary records were lost after this litigation commenced. *See* Sanctions Mot. at
18. The Court concludes that the disciplinary records are relevant. "It has been established that
comparative information concerning an employer's treatment of individuals is relevant evidence
in an individual discrimination claim." *Glenn v. Williams*, 209 F.R.D. 279, 281 (D.D.C. 2002);
*Minority Emps. at NASA (MEAN) v. Beggs*, 723 F.2d 958, 962 (D.C. Cir. 1983) ("It is well

established that statistical data and comparative information" showing an employer's treatment of other similarly situated employees is often relevant evidence because it "can be used by a plaintiff to make out a *prima facie* case of discrimination" or rebut a defense.).  The records, therefore, bear on an issue that may be in the case.  *See Oppenheimer Fund*, 437 U.S. at 351; *see also* 29 C.F.R. § 1602.14 (2024) (requiring employers to preserve "personnel or employment records relating to the aggrieved person *and to all other employees holding positions similar to that held or sought by the aggrieved person*" (emphasis added)).  QI should have preserved any records it had evidencing its treatment of other employees who failed to comply with QI's grooming standards.  Accordingly, the Court holds that Kalejaiye was prejudiced by QI's failure to preserve such records because the lack of records naturally makes it difficult for Kalejaiye to present comparator evidence.  *See hiQ Labs*, 639 F. Supp. 3d at 979 ("Prejudice exists [in Rule 37(e)(1) context] where the spoiling party's actions impaired the moving party's ability to go to trial or threatened to interfere with the rightful decision of the case." (cleaned up)).

\* \* \*

Because the Court holds that Kalejaiye suffered prejudice as a result of QI's failure to preserve electronically stored information, the Court must determine what remedy would best rectify the prejudice.  As explained by the advisory committee on civil rules when it amended Rule 37(e) in 2015

> Once a finding of prejudice is made, the court is authorized to employ measures "no greater than necessary to cure the prejudice."  The range of such measures is quite broad if they are necessary for this purpose.  There is no all-purpose hierarchy of the severity of various measures; the severity of given measures must be calibrated in terms of their effect on the particular case.  But authority to order measures no greater than necessary to cure prejudice does not require the court to adopt measures to cure every possible prejudicial effect.  Much is entrusted to the court's discretion.

Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.

The Court holds that "permitting the parties to present evidence and argument to the jury regarding the loss of information," and allowing the jury to make inferences therefrom, is the appropriate measure that is "no greater than necessary to cure the prejudice" from the loss of the records that Kalejaiye sought. *Id.*; *see also hiQ Labs*, 639 F. Supp. 3d at 980 (holding that a permissive—rather than mandatory—adverse inference was appropriate sanction under Rule 37(e)(1) where financially struggling company deleted relevant ESI without intent to deprive); *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 625 (N.D. Ill. 2022) (concluding in employment discrimination case that permissive—rather than mandatory—adverse inference was appropriate Rule 37(e)(1) sanction against defendant who lost relevant ESI); *Adamczyk v. Sch. Dist. of City of Hamtramck Pub. Sch.*, 667 F. Supp. 3d 534, 558 (E.D. Mich. 2023) (concluding that appropriate sanction under Rule 37(e)(1) was to permit plaintiff to "present evidence to the jury about the missing electronically stored information" and explaining that the Court would "instruct the jury that it may draw whatever inferences it considers appropriate from those facts against [d]efendant").  The Court will not preclude QI from offering evidence to counter an adverse inference as doing so would be closer to a measure authorized only under Rule 37(e)(2) and, thus, inappropriate here.  *See* Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment ("An example of an inappropriate (e)(1) measure might be an order . . . precluding a party from offering any evidence in support of, the central . . . defense in the case."); *see also id.* ("[E]ven grossly negligent behavior does not logically support [a mandatory adverse] inference."); *see also Borum*, 332 F.R.D. at 49 (explaining that "sanctions available following a finding of intent under Rule 37(e)(2) are not available under Rule 37(e)(1)" and that sanctions under

Rule 37(e)(1) should be commensurate with prejudice to movant).  Accordingly, the

Court grants in part and denies in part Kalejaiye's request for sanctions.

## B.  Title VII Claims

QI and Kalejaiye's competing motions for summary judgment revolve primarily around

whether QI violated Title VII of the Civil Rights Act of 1964 by failing to provide Kalejaiye

with a religious accommodation permitting Kalejaiye to grow his beard beyond the length

otherwise permitted under QI's grooming policies.  QI's motion for summary judgment also

argues that the evidence Kalejaiye presents cannot support a retaliation claim.[4]

The first count of Kalejaiye's complaint contends that QI's conduct constituted religious

discrimination because Kalejaiye held a bona fide religious belief requiring him to grow his

beard, that belief conflicted with QI's policies, Kalejaiye requested a religious accommodation,

QI refused an accommodation, and QI stopped employing Kalejaiye because he refused to shave.

*See* Compl. at 7.  The second count of Kalejaiye's complaint contends that QI retaliated against

him for requesting a religious accommodation and for filing a charge of discrimination with the

EEOC.  *See id.*  The Court assesses each claim in turn.

### 1.  Accommodation Claim

Under Title VII, it is unlawful for an employer to discharge or take negative employment

action against an employee because of that employee's religion.  42 U.S.C. § 2000e-2(a)(1).  In

the context of Title VII, religion "includes all aspects of religious observance and practice, as

well as belief, unless an employer demonstrates that he is unable to reasonably accommodate []

---

[4] Kalejaiye seeks summary judgment only on his accommodation claim and does not cross-move with respect to his retaliation claim.  *See* Pl.'s Mot. at 2 ("Plaintiff brings this Motion for Summary Judgment regarding Count I of his Complaint, which alleges that Defendant failed to reasonably accommodate his request for accommodation in violation of 42 U.S.C. § 2000e-2(a).").

an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).  "'[U]ndue hardship' is shown when a burden is substantial in the overall context of an employer's business."  *Groff v. DeJoy*, 600 U.S. 447, 468 (2023).  Naturally, QI argues that it did not violate Kalejaiye's rights under Title VII and Kalejaiye argues the opposite.

### a.  Analytical Framework

The Court must first determine what framework applies to assessing Kalejaiye's accommodation claim.  Plaintiffs usually base their Title VII "claim[s] on circumstantial evidence under the familiar *McDonnell Douglas* burden-shifting framework."  *Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016).  However, because Kalejaiye's claim is based on QI's failure to provide an accommodation, a modified version of *McDonnell Douglas* burden shifting is the appropriate analytical framework here.

D.C. Circuit precedents in the Rehabilitation Act and Americans with Disabilities Act contexts hold that "accommodation claim[s] [are] not subject to analysis under *McDonnell– Douglas*," but instead have their "own specialized legal standards."  *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998).  But the D.C. Circuit has not explained how or whether these "specialized legal standards" apply to Title VII accommodation claims.  *See Flemmings v. Howard Univ.*, 198 F.3d 857, 860 (D.C. Cir. 1999) ("[I]n [*Aka*] this court addressed the protocol for evaluating reasonable accommodation claims *under the ADA*." (emphasis added)).

The Court observes, however, that courts in this district, as well as in other circuits, have applied a modified *McDonnell Douglas* type framework to religious accommodation claims that is analogous to the D.C. Circuit's analysis of disability accommodation cases.  *Compare Aka*,

156 F.3d at 1288–1300 (explaining that accommodation analysis starts by asking whether plaintiff was qualified for accommodation and, if so, continues by inquiring into whether employer defendant would face undue burden if forced to provide that accommodation) *with Francis v. Perez*, 970 F. Supp. 2d 48, 60 (D.D.C. 2013), *aff'd*, No. 13-5333, 2014 WL 3013727 (D.C. Cir. May 16, 2014) (explaining that plaintiff must first satisfy criteria for prima facie case and if a plaintiff satisfies that criteria the defendant employer must show that it was "unable reasonably to accommodate the plaintiff's religious needs without undue hardship" (citation omitted)) *and Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000) (same).  More specifically, "[t]o survive summary judgment on a religious discrimination claim of failure to accommodate, the employee initially bears the burden of production with respect to a prima facie case."  *Thomas*, 225 F.3d at 1155.

> To establish a prima facie case of discrimination based on a failure to provide a reasonable [religious] accommodation, plaintiff must show that []he (1) held a bona fide religious belief conflicting with an employment requirement; (2) informed h[is] employer of h[is] belief; and (3) faced an adverse employment action due to h[is] failure to comply with the conflicting employment requirement.

*Francis*, 970 F. Supp. 2d at 60 (cleaned up); *Thomas*, 225 F.3d at 1155 (same).  "Once a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to show that it was unable reasonably to accommodate the plaintiff's religious needs without undue hardship."  *Francis*, 970 F. Supp. 2d at 60 (citation omitted); *Thomas*, 225 F.3d at 1155 (same); *see also, e.g.*, *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (applying same analysis); *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014) (applying same analysis).

At that point, the question becomes whether there is a genuine dispute of material fact with respect to the employer's undue hardship.  *See, e.g., Davis*, 765 F.3d at 489 (assessing whether a genuine dispute of material fact existed respecting "whether [the defendant] would have suffered undue hardship in accommodating [the plaintiff's] religious observance").  The

Court begins by assessing whether Kalejaiye can establish a prima facie case of Title VII religious discrimination based on QI's failure to accommodate and then proceeds to the undue hardship inquiry.

### b.  Application to Kalejaiye's DOT Beard Waiver Accommodation

#### i.  Prima facie case

Kalejaiye can make out a prima facie case of religious discrimination based on QI's failure to accommodate his religious beard growth and refusal to permit him to grow his beard while working at the DOT facility.  "To establish a prima facie case of discrimination based on a failure to provide a reasonable accommodation, [P]laintiff must show that [he] (1) held a bona fide religious belief conflicting with an employment requirement; (2) informed [his] employer of [his] belief; and (3) faced an adverse employment action due to [his] failure to comply with the conflicting employment requirement."[5]  *Francis*, 970 F. Supp. 2d at 60 (quotation marks and citation omitted); *Thomas*, 225 F.3d at 1155 (same); *Davis*, 765 F.3d at 485 (same); *Firestone Fibers*, 515 F.3d at 312 (same); *see also Lowe v. Mills*, 68 F.4th 706, 719 (1st Cir. 2023) (to state prima facie case of religious discrimination, plaintiff must demonstrate that his "bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action" (quotation marks and citation omitted)); *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1275 (11th Cir. 2021) (Plaintiff can set forth a "prima facie case by showing

---

[5]  The Court is not convinced that an adverse employment action is always necessary to satisfy a prima facie case for employment discrimination.  For instance, it may be that where an employee capitulates under pressure from an employer and compromises his religious beliefs in an effort to avoid losing his job, the plaintiff would still be able to make out a prima facie case. *C.f. Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 146 (1987) ("State [employer] may not force an employee to choose between following the precepts of her religion and forfeiting benefits and abandoning one of the precepts of her religion in order to accept work." (cleaned up)).  However, because Kalejaiye was subjected to an adverse employment action, the Court need not address that issue here.

that (1) his sincere and bona fide religious belief conflicted with an employment requirement, and (2) his employer took adverse employment action against him because of his inability to comply with the employment requirement or because of the employer's perceived need for his reasonable accommodation.").

Here, Kalejaiye asserts that he had a bona fide religious belief that conflicted with QI's beard length policy, he informed QI of that religious belief, requested an accommodation, the requested accommodation was denied, and he was removed from the security officer rotation at the DOT facility because of his refusal to comply with QI's beard-length policy. *See* Compl. at 7; Pl.'s Mot., Ex. 8 ("Letter from Abayomi Kalejaiye to Zebedee Middleton"), ECF No. 87-4; Pl.'s Mot. at 7–8; Pl.'s Mot., Ex. 31 at 1–2, ECF No. 87-9.  QI counters that Kalejaiye has failed to state a prima facie case because (1) his religious belief that prohibits him from cutting his beard is not sincerely held, evidenced by the fact that he has cut his beard in the past, and (2) Kalejaiye's blame is misplaced because DOT, not QI, refused his accommodation. *See* Def.'s Opp. at 9–10.

QI's arguments are unpersuasive.  Plaintiff consistently asserted that his religious beliefs prohibited him from shaving his beard and refused to shave.  *See* Response to Undisputed Facts at 28–29.  The fact that Kalejaiye may have cut his beard in the past does not refute that his religious beliefs prohibited him from shaving while employed with QI.  *See Keene v. City & Cnty. of San Francisco*, No. 22-16567, 2023 WL 3451687, at *2 (9th Cir. May 15, 2023) ("[R]eligious belief need not be consistent or rational to be protected under Title VII, and an assertion of a sincere religious belief is generally accepted."); *Singh v. Holder*, 720 F.3d 635, 644 (7th Cir. 2013) ("[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders,

penitents, and prodigal sons?" (citation omitted)).[6]  So, at the very least, a dispute of fact exists

and it will be up to a jury to determine whether Kalejaiye's religious beliefs are sincerely held.

Moreover, whether the government or QI denied Kalejaiye's accommodation request is

not pertinent at the prima facie stage because QI removed Kalejaiye from the guard rotation as a

result of Kalejaiye's failure to abide by QI's grooming policies on account of his religious

practice.  If DOT bears responsibility for the decision not to afford Kalejaiye an accommodation,

that may relate to whether QI would face an undue hardship if forced to accommodate Kalejaiye,

not to whether Plaintiff has made out a prima facie case.  Accordingly, Kalejaiye has stated a

prima facie case.

### ii.  Undue burden

The Court next assesses whether there exists a genuine dispute of material fact regarding

whether QI "was unable reasonably to accommodate [Kalejaiye's] religious needs without undue

hardship."  *Thomas*, 225 F.3d at 1156.  QI contends that its reason for failing to accommodate

Kalejaiye was that the government contract pursuant to which QI was working prohibited QI

from employing Kalejaiye at the DOT facility while his beard exceeded 1/4 inches in length

unless the government approved a religious accommodation, and the government refused such

approval.  *See* Def.'s Mot. at 2–3; Def.'s Opp. at 7.  Moreover, QI contends that maintaining

Kalejaiye on its payroll while he was unable to perform his duties at the DOT facility would

have constituted an undue hardship.  *See* Def.'s Mot. at 24, 31; Def.'s Opp. at 11.

---

[6] The Court also observes that the judicial system is "singularly ill equipped" to determine what a party's religious belief requires because "Courts are not arbiters of scriptural interpretation."  *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981) (refusing, in the First Amendment context, to find that a petitioner's practice was not sincere merely because other members of his religion did not share the same practice).

Kalejaiye disputes QI's assertion than an accommodation would have caused an undue hardship.  First, Kalejaiye says, under QI's contract with the government—as well as under DOT's then-existing policy—it was QI's responsibility to grant religious accommodation requests in the first instance and QI did not do so.  *See* Pl.'s Opp. at 27; Pl.'s Mot. at 24–25. From this fact, Kalejaiye infers that QI could have granted an accommodation without violating its contract with the government and that QI chose not to do so.

QI presents evidence to the contrary—showing that employees' accommodation requests needed to be approved by DOT and that it took Kalejaiye's request to DOT.  *See* Def.'s Mot. at 19; Def.'s Opp. at 11.  Specifically, QI points to the deposition testimony of one of its former employees, Jason Ricks, who stated that "I personally went to the Government myself and presented [Kalejaiye's] case, only to be denied that [DOT] were going to accommodate anything . . . So I know I, personally, presented it to the Government."  Jason Ricks Depo. at 37, ECF No. 86-11.  Ricks explained his understanding that there were "multiple conversations, multiple attempts over the course of months, trying to present [Kalejaiye's accommodation request] to the Government, trying to present different things to get them to approve.  But ultimately they would not honor that request, which would make [Kalejaiye] out of compliance if he continued to work on the contract."  *Id.* at 37–38.  When asked by Plaintiff's counsel whether he personally argued on Plaintiff's behalf, Ricks stated "I actually personally took his request when it was brought to my attention in June upstairs to the Government, sat down in front of Michael Anderson, who was the supervisory COR, and presented the request to him."  *Id.* at 38. Ricks continued by explaining that Anderson, a DOT employee, denied Kalejaiye's request on safety grounds and that Ricks related that information to Kalejaiye.  *Id.*  Ricks states that he

attempted to convince Anderson to authorize Kalejaiye's religious accommodation request.  *Id.* at 40–41.

QI's contention that it was required to get approval of accommodations from DOT is bolstered by the deposition of Demetria McCoy who served as a project manager and director of operations for QI.  McCoy testified that, per her understanding of QI's contract with the government, religious beard waivers had to be approved by DOT.  *See* Demetria McCoy Depo. at 21, ECF No. 86-13.  She also testified that Jason Ricks brought a binder with a photo of Kalejaiye to DOT during a meeting—presumably so Ricks could request a beard exemption for Kalejaiye.  *See* McCoy Depo. at 25–26.

But Plaintiff has presented contrary evidence to show that QI did not, in fact, request that DOT authorize a religious accommodation permitting him to grow his beard beyond 1/4 inch in length and that its contract with the government did not require it to do so.  *See* Pl.'s Mot. at 25; Pl.'s Opp. at 5–6; Szakal Declaration at 4–5, ECF No. 92-3, Ex. 2.  Declarant Keith Szakal, a DOT supervisor, attested that "DOT does not review or decide reasonable accommodation requests that are made by employees of contractors."  Szakal Declaration at 3, Ex. 2. Additionally, Kalejaiye points out that the Statement of Work, a document articulating the scope of QI's responsibilities and requirements pursuant to its contract to provide security officer services for DOT, specifies that "[c]ontractors shall grant reasonable accommodations to the . . . religious practices" of security officers.  Pl.'s Statement of Material Fact Not in Dispute at 12, ECF No. 87-1 (italics omitted); *see* Pl.'s Opp. at 27; Def.'s Mot., Ex. 7 (Statement of Work).  The Statement of Work could reasonably be read to mean that contractors, like QI, rather than DOT, were responsible for granting accommodation requests in the first instance. Additionally, Kalejaiye alleges that other security officers were permitted to deviate from QI's

grooming standards.  *See* Pl.'s Opp. at 28.  There are, thus, genuine disputes of material fact regarding whether QI or DOT was responsible for resolving Kalejaiye's religious accommodation request.

Kalejaiye also argues that Title VII does not permit QI to contract around its accommodation obligations and that QI's contract with the government cannot form the basis for QI's argument that it would suffer an undue hardship because such an argument would permit QI to circumvent Title VII.  *See* Pl.'s Opp. at 11.  It is true that QI has an obligation to comply with the religious accommodation strictures of Title VII regardless of whether DOT told QI that it could not post security officers with beards.

Be that as it may—and as explained above—Title VII only requires an employer to provide a reasonable accommodation *if doing so would not cause an undue hardship*.  *See* 42 U.S.C. § 2000e(j); *see also Thomas*, 225, F.3d at 1156 (employer need not provide accommodation if doing so would cause undue hardship).  Undue hardship implicates a condition imposed on an employer that "would result in substantial increased costs in relation to the conduct of its particular business."  *Groff*, 600 U.S. at 470.  If QI's evidence is credited, QI would have borne an undue hardship by retaining Kalejaiye because doing so would either require it to go against DOT's direction or keep Kalejaiye on the payroll without being able to employ him on a contract.  *See id.* at 470 (substantial increased cost in relation to business constitutes undue hardship); *c.f., Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 79 (1977) (holding that a contract may not be employed to violate Title VII, but that the duty to accommodate does not require an employer to take steps inconsistent with an otherwise valid agreement); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999) ("[C]ourts agree that an employer is not liable under Title VII when accommodating an

employee's religious beliefs would require the employer to violate federal or state law.").[7] Accordingly, a jury is necessary to determine which entity—DOT or QI—was responsible for approving Kalejaiye's religious accommodation request.  If DOT was responsible, QI can show that it would have suffered an undue hardship if it had been forced to accommodate Kalejaiye and if QI was responsible, Kalejaiye can show that QI would not have faced an undue hardship by accommodating him.

Because QI relies on DOT's refusal as the basis for its inability to grant Kalejaiye's request, this fact is material.  Depending on what evidence a jury finds more credible, a jury could decide either way with respect to whether QI could grant Kalejaiye's request consistent with its contract with DOT.  Accordingly, because there is a genuine dispute of material fact with respect to whether accommodating Kalejaiye by permitting him to grow out his beard while working at the DOT site would have caused an undue hardship, summary judgment is inappropriate.

---

[7] Plaintiff cites to three out-of-district cases—including the Fifth Circuit's opinion in *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015)—where courts held that a defendant could not escape liability for employment discrimination by showing that a third party made the ultimate decision with respect to the negative employment decision.  *See* Pl.'s Opp. at 11–18.  Defendant, by contrast, counters that courts have held that in joint employer cases, the "joint employer must bear some responsibility for the discriminatory act to be liable for an" employment discrimination violation.  Def.'s Reply at 9 (quoting *Burton*, 798 F.3d at 228).

Ultimately, however, the cases that both parties rely on are distinguishable because they do not involve an undue hardship inquiry.  Because an employer's failure to accommodate is unlawful only when accommodation would not cause an undue hardship, if QI can show that it faced an undue hardship its conduct would not be unlawful.  QI may be able to prove that it would face an undue hardship if it employed Kalejaiye at the DOT facility in defiance of DOT direction.  *C.f. Hardison*, 432 U.S. at 79 (1977); *Thomas*, 225 F.3d at 1156 (duty to accommodate does not require employer to violate collective bargaining contract).  Accordingly, this case is different from cases that do not involve an undue hardship defense.

### c. Application to the DOL Accommodation

Separate from Kalejaiye's request for a beard-length accommodation at the DOT facility, Kalejaiye asserts that QI could have provided an accommodation by transferring him to QI's contract providing security officers to a DOL facility where, Kalejaiye says, gas masks were not utilized.[8] *See* Pl.'s Opp. at 29. Having concluded above that Kalejaiye established a prima facie case, the Court turns to whether a dispute of material fact exists respecting whether transferring Kalejaiye to the DOL facility would have caused QI an undue burden.

QI denies the premise of Kalejaiye's argument that it could simply move him to the DOL contract. QI asserts that although it considered transferring Kalejaiye to the DOL facility contract, doing so would have caused it an undue hardship because (1) QI had no vacancy in which to hire a new employee under its DOL facility contract, (2) hiring for the DOL contract

---

[8] QI argues that Kalejaiye did not raise his DOL transfer argument in his EEOC charge or complaint and that the argument is unexhausted. *See* Def.'s Mot. at 26. The Court disagrees. Kalejaiye's DOL transfer argument merely supports his overarching Title VII failure to accommodate claim. Kalejaiye's EEOC charge alleged that QI discriminated against him by failing to accommodate his religious beliefs. *See generally* Charge of Discrimination. His argument that he should have been transferred to the DOL contract as an accommodation is simply another detail adding to that failure to accommodate claim. Kalejaiye need not have used any specific wording in his EEOC Charge to exhaust his failure to accommodate claim. *See Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) ("Naturally every detail of the eventual complaint need not be presaged in the EEO[] filing"); *Maryland v. Sodexho, Inc.*, 474 F. Supp. 2d 160, 162 (D.D.C. 2007) (explaining that "the law does not hold an employee to the use of magic words to make out a proper discrimination charge" so long as the employee "alert[s] the EEOC and the charged employer with the nature of the alleged wrongdoing"); *President v. Vance*, 627 F.2d 353, 362 (D.C. Cir. 1980) ("Title VII's exhaustion requirement should not be read to create useless procedural technicalities"). The important point is that Kalejaiye's EEOC charge "contained sufficient information to put [QI] on notice of the claim and to enable [QI] to investigate it." *Crawford v. Duke*, 867 F.3d 103, 109 (D.C. Cir. 2017) (cleaned up). Here, Kalejaiye alleged to the EEOC that QI failed to accommodate his religious beliefs. *See* Charge of Discrimination at 1 ("I requested a religious accommodation to Mr. Middleton, Lieutenant in accordance with my chain of command."). Certainly, QI understood and was on notice of this aspect of Kalejaiye's claim because it was its own HR contractor that considered the potential accommodation through transfer to the DOL contract. Thus, Kalejaiye need not have separately exhausted this aspect of his failure to accommodate claim.

was separate from the DOT contract, (3) DOL facility security officers required different
certifications—meaning that it could not simply reassign Kalejaiye to the DOL facility, and (4)
the government's grooming standards applied the same way at the DOL facility—meaning that
transferring Kalejaiye would not have solved the beard-length issue.  *See* Lane Depo. at 35;
McCoy Depo. at 13, ECF No. 87-10; Def's Mot. at 25–26.  As part of its argument, QI further
explains that moving Kalejaiye to the DOL facility would have resulted in taking away "shifts
f[rom] the qualified DOL contract employees" because QI had no other openings at that facility.
Def.'s Mot. at 26–27.  Additionally, QI argues that transferring Kalejaiye to the DOL facility
outside of the regular hiring procedures would have been difficult because "there was no process
for a security guard to transfer from one site to another."  *Id.* at 27.  Accordingly, QI argues, that
moving Kalejaiye was either infeasible or, at a minimum, would have caused it an undue
hardship.

By contrast, Kalejaiye argues that moving him would not have caused QI an undue
hardship and that QI's explanation for its undue hardship lacks credibility.  In support of this
assertion, Kalejaiye argues that QI's HR contractor raised the possibility of transferring him, but
that QI never seriously considered or tried to move him to the DOL contract.  *See* Response to
Undisputed Facts at 39–40; Pl.'s Mot. at 29–34.  Kalejaiye points out that one of QI's HR
contractors "asked the question" if it was possible that Kalejaiye could "be moved into the
Department of Labor Building" but that QI said "they did not have any openings."  *See* Pl.'s
Mot. at 30 (quoting Lane Depo, Pl.'s Mot., Ex. 33, ECF No. 87-9).  And Kalejaiye points to
evidence that an employee could, in fact, be moved as an accommodation.  *See* Pl.'s Mot. at 32
(quoting a deposition in which a QI employee stated "I've had situations unrelated to this where

a person had to be moved in order to be accommodated.  The pay stays the same, the shift might change, maybe it gets better." (quoting Peterson Depo, Pl.'s Mot, Ex. 32, ECF No. 87-9)).

But, Kalejaiye argues, the evidence shows that QI "does not know whether anyone actually investigated whether it was possible to accommodate Plaintiff by transferring him to the DOL contract."  Pl.'s Mot. at 33 (italics omitted).  Specifically, Plaintiff directs the Court's attention to the deposition of Demetria McCoy, who served as a project manager and director of operations for QI.  *Id.* at 32.  When asked whether she had ever investigated moving Kalejaiye off the DOT contract and onto the DOL contract, McCoy responded "no," that she "was never asked that question," and never investigated moving Kalejaiye of her own initiative.  McCoy Depo., Ex. 38 at 13, ECF No. 87-10.   McCoy explained that moving Plaintiff to the DOL contract "wouldn't have been an option" because the DOL contract "follow[ed] the same [grooming] standards" as the DOT contract.  *Id.*  If QI never bothered to inquire into whether it would be possible or difficult to transfer Kalejaiye to the DOL contract, Kalejaiye says, QI had no way of knowing whether transferring him would pose an undue hardship.  And Kalejaiye points out that the hiring standards were functionally equivalent between the DOT and DOL sites, see Pl.'s Opp. at 33 (quoting McCoy Depo.), and that he had already satisfied those criteria, *see id.* at 34 ("DOL contract did not have any additional requirements that Plaintiff would have to meet that he had not already met before being deployed to the DOT contract").

Accordingly, there remains a genuine dispute over whether moving Kalejaiye to the DOL contract would have caused an undue hardship.  Given that a reasonable jury could find for either party with respect to this factual dispute—which will determine whether QI refused to consider a reasonable accommodation—summary judgment is not appropriate on this point.

\*   \*   \*

26

In summary, genuine disputes of material fact exist with respect to both (1) whether allowing Kalejaiye an accommodation to grow his beard at the DOT facility would have caused QI an undue hardship and (2) whether QI assessed if it could accommodate Kalejaiye by moving him to a different contract and whether moving him to that contract would have caused an undue hardship. Accordingly, summary judgment is not appropriate with respect to either QI or Kalejaiye's motions on Kalejaiye's accommodation claim.

### 2. Retaliation Claim

QI asserts that the undisputed facts do not support Kalejaiye's Title VII retaliation claim. *See* Def.'s Mot. at 21. Title VII's anti-retaliation provision makes it unlawful for an employer "to discriminate against [an] employee[] . . . because he has opposed any practice" prohibited by Title VII (known as the "opposition clause") or "has made a charge, testified, assisted, or participated in" a Title VII proceeding (known as the "participation clause"). 42 U.S.C. § 2000e–3(a). The *McDonnell Douglas* "framework [] governs our analysis of [Kalejaiye's] claims of unlawful retaliation in violation of 42 U.S.C. § 2000e–3(a)." *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003). "The only difference is the phrasing of the prima facie case: 'In order to establish a prima facie case of retaliation, a plaintiff must show: 1) that [he] engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two.'" *Id.* (citation omitted). If a plaintiff can support a prima facie case, the defendant has an opportunity to provide a nonretaliatory reason for its employment decision. *Id.* Once a defendant proffers a nonretaliatory reason, the Court "proceed[s] to the ultimate issue of retaliation vel non." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).

### a.  Statutorily Protected Activity

The Court starts with whether Kalejaiye has provided evidence that he "engaged in a statutorily protected activity."  *Morgan*, 328 F.3d at 651.  Kalejaiye argues that he was retaliated against because he requested an accommodation.  *See* Compl. at 7.  In other contexts, this Court and the D.C. Circuit have held that requesting an accommodation constitutes statutorily protected activity.  *See Floyd v. Lee*, 968 F. Supp. 2d 308, 333 (D.D.C. 2013) (this Court holding that "the retaliation provision of the Congressional Accountability Act, like the nearly identical provision in the Americans with Disabilities Act, protects employees who request a reasonable accommodation from retaliation on that basis"); *Solomon v. Vilsack*, 763 F.3d 1, 15 (D.C. Cir. 2014) (holding that "requesting in good faith a reasonable accommodation is a protected activity under 42 U.S.C. § 12203"); *Menoken v. Dhillon*, 975 F.3d 1, 11 (D.C. Cir. 2020) ("no dispute the complaint alleged that [plaintiff] engaged in statutorily protected activity by requesting a reasonable accommodation for a disability"); *Minter v. D.C.*, 809 F.3d 66, 70 (D.C. Cir. 2015) (treating request for accommodation as protected activity).

The Court recognizes, however, that there is "a division of authority on the issue whether a request for *religious* accommodation constitutes protected activity for purposes of a retaliation suit," *Touvian v. D.C.*, 330 F. Supp. 3d 246, 251 n.3 (D.D.C. 2018) (collecting cases) (emphasis added); *compare Payne v. Salazar*, 899 F. Supp. 2d 42, 52 (D.D.C. 2012) (request for accommodation "does not constitute protected activity as defined by Title VII"), *and Equal Emp. Opportunity Comm'n v. N. Mem'l Health Care*, 908 F.3d 1098, 1103 (8th Cir. 2018) ("merely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation" (citation omitted)), *with Rashad v. Wash. Metro. Area Transit*

*Auth.*, 945 F. Supp. 2d 152, 167 (D.D.C. 2013) (treating request for religious accommodation as protected activity).

Nevertheless, given D.C. Circuit precedents holding "that the act of requesting in good faith a reasonable accommodation is a protected activity under" the ADA, *see, e.g.*, *Solomon*, 763 F.3d at 15, and the fact that there is no persuasive reason to distinguish requesting an accommodation in the ADA context from requesting an accommodation in the Title VII context, the Court concludes that requesting a religious accommodation is a statutorily protected activity, *see*, *e.g.*, *Floyd*, 968 F. Supp. 2d at 331 (concluding that "retaliation provisions of the Congressional Accountability Act and the Americans with Disabilities Act are, for present purposes, indistinguishable" and therefore holding that requesting an accommodation under the CAA was a protected activity).

Kalejaiye's complaint also asserts that he was retaliated against "for filing a charge of discrimination with the EEOC" against QI.  *See* Compl. at 7.  And "[t]he 'filing of an EEO Complaint' is protected EEO activity for which retaliation is unlawful."  *Jones v. U.S. Dep't of Just.*, 111 F. Supp. 3d 25, 32 n.7 (D.D.C. 2015) (citing 42 U.S.C. § 2000e–3(a)).  Because Kalejaiye was terminated, there is no dispute that QI took an adverse employment action against him.  *See Durant v. D.C. Gov't*, 875 F.3d 685 (D.C. Cir. 2017) (termination amounts to adverse employment action).[9]  The Court therefore turns to whether that adverse employment action was causally related to either protected activity.

---

[9] Kalejaiye also stated that QI retaliated by denying his accommodation request, *see* Compl. at 7, but the denial of an accommodation request does not amount to an adverse employment action because "if the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled."  *Floyd*, 968 F. Supp. 2d at 334.

*b. Causation*

i. Retaliation for accommodation request

Kalejaiye has provided sufficient facts to show "a causal connection existed between" his accommodation request and his termination. For instance, Kalejaiye points to the facts that he was terminated shortly after requesting an accommodation and that he was treated differently from other employees who wore beards with lengths in excess of QI's policy and who did not request an accommodation. *See* Pl.'s Opp., Ex. 13, ECF No. 92-5; Pl.'s Opp. at 28. And Kalejaiye continued to attempt to receive an accommodation throughout his tenure working for QI. The burden to satisfy a prima facie case is not onerous, *see Oviedo v. WMATA*, 299 F. Supp. 3d 50, 60 (D.D.C. 2019); *Gipson v. Wells Fargo, N.A.*, 460 F. Supp. 2d 15, 25 (D.D.C. 2015) (same), and here, at the very least, there is a dispute of material fact with respect to the causation element. Accordingly, the burden shifts to QI to show that it had a legitimate non-retaliatory reason for terminating Kalejaiye after he requested an accommodation. *See Morgan*, 328 F.3d at 651.

ii. Retaliation for EEOC charge

Kalejaiye cannot, however, show that "a causal connection existed between" the filing of his EEOC charge and the adverse employment action QI took against him. *Id.* Kalejaiye presents no evidence that any action taken against him resulted from the filing of his EEOC Charge of discrimination. *See Cutchin v. D.C.*, 369 F. Supp. 3d 108, 118 (D.D.C. 2019) ("Unsupported allegations or conclusory statements are not sufficient to defeat summary judgment." (citing *Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009))). Rather, all of Kalejaiye's evidence relates to his request for an accommodation. *See generally* Pl.'s Opp. Moreover, the conduct that Kalejaiye complains of occurred before he filed his EEOC charge. *See* Charge of Discrimination (filed with EEOC on

June 26, 2018); Disciplinary and Termination Request, ECF No. 86-25 (sent by QI on June 22, 2018); Quality Investigations, Inc. Removal from Schedule, Ex. 19, ECF No. 92-6 (sent by QI on June 21, 2018).  "[A] plaintiff cannot base a retaliation claim on events that took place prior to the time she first engaged in EEO activity."  *Payne*, 899 F. Supp. 2d at 53; *Lewis v. D.C.*, 653 F. Supp. 2d 64, 79 (D.D.C. 2009) ("The fact that the alleged retaliatory actions preceded the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff.").  Because no reasonable juror could find that Kalejaiye satisfied his burden with respect to his prima facie case for retaliation based on the filling of his EEOC charge, this claim fails, and the Court will grant QI summary judgment in this respect.

### c.  Non-Retaliatory Reason and Pretext

Finally, the Court turns to whether a dispute of material fact exists with respect to QI's proffered non-retaliatory reason for terminating Kalejaiye after Kalejaiye requested an accommodation.  If a plaintiff can make out a prima facie case for retaliation, the burden shifts, meaning the employer must articulate a legitimate, non-retaliatory reason for its action.  *See Bernanke*, 557 F.3d at 678.  If the employer is successful in doing so, the plaintiff must show that the employer's reason was pretextual.  *Id.*

QI asserts that it had a legitimate non-retaliatory reason for terminating Kalejaiye—namely, that he was out of compliance with QI's grooming policy.  *See* Def.'s Mot. at 23–25; Disciplinary and Termination Request, ECF No. 86-25.  There is no dispute that Kalejaiye was, in fact, out of compliance.  In support of its assertion that it did not terminate Kalejaiye because of his accommodation request, QI has also pointed to evidence showing that it attempted on several occasions to provide Kalejaiye with an accommodation but was stymied by the

government, which it contends shows that it bore no ill will towards Kalejaiye for seeking that accommodation.  *See* Def.'s Mot. at 24; Jason Ricks Depo., Ex. 10 at 37, ECF No. 86-11.

But Kalejaiye has presented sufficient evidence to create a genuine dispute of material fact regarding whether QI's reasons for terminating Kalejaiye are pretextual.  First, Kalejaiye points to photographs showing other security officers—including Kalejaiye's supervisor—wearing beards in excess of the length permitted by QI's grooming policy.  *See* Pl.'s Opp., Ex. 13, ECF No. 92-5.  And he contends that none of these individuals had ever requested a religious accommodation.  *See* Pl.'s Opp. at 28 (citing Pl.'s Opp., Ex. 7, Coates Depo. at 46:1, ECF No. 92-4).  Moreover, Kalejaiye asserts, none of the individuals were terminated for having a beard that was out of compliance.  *Id.*  The only thing that makes him different, Kalejaiye argues, is that he requested an accommodation.  *See id.*  Taken together, Kalejaiye says, the fact that none of the other similarly situated out-of-compliance officers were terminated shows that it was Kalejaiye's request for an accommodation that caused QI to terminate him.  *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) ("plaintiff can establish pretext . . . by presenting evidence suggesting that the employer treated other employees [who were similarly situated] . . . more favorably in the same factual circumstances (cleaned up)); *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (same).  Because a reasonable jury could conclude that QI terminated Kalejaiye because he requested an accommodation, there is a genuine dispute of material fact and QI's motion is denied in this respect.

### C.  Tortious Interference Claim

QI also seeks summary judgment with respect to Kalejaiye's District of Columbia common law claim for tortious interference with prospective business advantage.[10]  *See* Def.'s Mot. at 28.  Kalejaiye's tort claim rests on the allegation that QI excluded his name from a personnel list that QI provided DOT, which in turn provided the list to the new contractor that took over QI's contract with DOT.  *See id.*; Compl. at 8.  This personnel list was used by the new contractor for purposes of holding a job fair for the potential hiring of former QI security officers.  *See* Def.'s Mot. at 28; Compl. at 8.

Under DC law, "[t]he elements of tortious interference with prospective business advantage mirror those of interference with contract. . . . To prevail, however, a plaintiff obviously need not demonstrate the existence of a contract, but merely a prospective advantageous business transaction."  *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003) (citation omitted).  Thus, to prevail on his tort claim, Kalejaiye must show that (1) he had a prospective advantageous business transaction, (2) that QI had knowledge of that prospective advantageous business transaction, (3) that QI intentionally interfered with the prospective advantageous business transaction, and (4) damages resulting from the interference.  *See Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 289 (D.C. 1989); *Brown v. Carr*, 503 A.2d 1241, 1247 (D.C. 1986) ("To establish a prima facie case of interference with business relations, 'a plaintiff must show that the interference was intentional and that there was resulting damage.'" (citation omitted)).  For the reasons set forth below, Kalejaiye's tortious interference claim fails because he cannot show he

---

[10] Kalejaiye does not cross-move for summary judgment on his tortious interference claim.  *See generally* Pl.'s Mot.

meets either the first or third elements required for such a claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

### 1.  Prospective Advantageous Business Transaction

The Court starts with whether Kalejaiye had a prospective advantageous business transaction.  QI contends that "because Plaintiff had been off of the QI contract for nine months" Kalejaiye could not have had a prospective business advantage in employment with the new contractor because he "had long since been removed" from the DOT facility guard contract.  *See* Def.'s Mot. at 29; Kalejaiye Depo. at 137–138, ECF No. 86-6 ("Q. So if this job fair was in March of 2019, that was nine months after you last worked at QI at the FAA building? A. Yes."). For his part, Kalejaiye argues that his relationship with QI ended fewer than nine months before the guard list was presented to the new contractor for its job fair because he was terminated on October 4, 2018—only roughly 5 months before the job fair, which occurred in March of 2019. *See* Pl.'s Opp. at 39; Kalejaiye Depo. at 137.  Moreover, Kalejaiye says, QI never informed him that he was terminated and so he did not lose his expectancy in the prospective business transaction.  Pl.'s Opp. at 39.

The Court holds that, even viewed in the light most favorable to him, Kalejaiye did not have a prospective business advantage in employment with the new contractor.  The D.C. Court of Appeals has explained that intentional interference with prospective economic advantage requires a plaintiff to show "business expectancies, not grounded on present contractual relationships but *which are commercially reasonable to anticipate."  Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 351 (D.C. 2015) (citation omitted); *see also Robertson v.*

*Cartinhour*, 867 F. Supp. 2d 37, 60 (D.D.C. 2012), *aff'd*, 553 F. App'x 1 (D.C. Cir. 2014) ("A valid business expectancy requires a probability of future contractual or economic relationship and not a mere possibility." (citation omitted)).  Because Kalejaiye had not worked at the DOT facility for nine months prior to the job fair, it is not "commercially reasonable to anticipate" that he would still be included on the guard rotation list that QI submitted to the government and which the government provided to the new contractor.  *See Havilah Real Prop. Servs.*, 108 A.3d at 351 (explaining that it is only "commercially reasonable to anticipate" a future economic relationship where one can gauge the "likelihood that the plaintiff would have received" the economic benefit and the likelihood is a "probability," not a "mere possibility" (citations omitted)).  While it is *possible* that QI could have kept Kalejaiye listed as an employee despite not employing him for nine months, a "mere possibility" is insufficient.  *Robertson*, 867 F. Supp. 2d at 60.  No reasonable juror could conclude that it was commercially reasonable for Kalejaiye to anticipate a business expectancy after he had not been to work at the DOT facility in nine months.  Thus, Kalejaiye "fails to make a showing sufficient to establish the existence of" the prospective advantageous business transaction element "essential to [his] case"—"on which [Kalejaiye] w[ould] bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

### 2. Intent

Nor does the evidence presented bear out that QI intentionally interfered with any prospective business relationship.[11]  In support of his claim that QI intentionally interfered with a prospective advantageous business transaction, Kalejaiye points to the deposition of Jason Ricks

---

[11] Having determined that Kalejaiye could not satisfy his burden with respect to one element of his tortious interference claim, the Court need not address the other elements. *Celotex*, 477 U.S. at 322.  Nevertheless, the Court explains why Kalejaiye cannot satisfy the intent element either.

for the proposition that "QI removed Plaintiff's name from the roster list, knowing that he would

thereafter be denied the opportunity to transition to the new guard company." Pl.'s Opp. at 40

(citing the deposition of Jason Ricks at 92, Ex. 24, ECF No. 92-7). Ricks's deposition, however,

does not state that QI removed Plaintiff from the personnel list to interfere with his business

relationship. Rather, Ricks explained that new contractors receive a list from the government of

"all personnel on the contract" and that Kalejaiye's name was not on that list "[b]ecause he was

no longer a member of the contract as of – at the time that the transition began." Ricks Depo. at

92. Ricks's statements do not support the inference that QI intentionally interfered with

Kalejaiye's prospective business relationship. Kalejaiye has not provided evidence countering

QI's evidence that it removed Kalejaiye from the DOT guard rotation list because he was no

longer working for QI on the DOT contract. Accordingly, Kalejaiye has also failed to show that

he could satisfy the third element of his tortious interference claim, i.e., that QI intentionally

interfered with his prospective business relationship.[12]

* * *

There is no genuine dispute of material fact with respect to whether Kalejaiye had a

prospective advantageous business transaction and with respect to whether QI intentionally

interfered with a prospective business transaction. Because no reasonable juror could conclude

---

[12] Although it is less certain based on the record presented by the parties, the Court observes that it is likely Kalejaiye also fails to satisfy his burden with respect to the knowledge element of his tortious interference claim. This is so because there is no evidence that QI realized it would be replaced by another contractor when it removed Kalejaiye's name from the DOT facility guard rotation list. QI's contract with the Federal Government ended in 2019 (after it terminated Kalejaiye), but it is not clear from the record when QI was informed that its contract would not be renewed. *See* Peterson Depo at 14, ECF No. 86-3. If QI was unaware that it would be replaced when it removed Kalejaiye from its personnel list, it would not have known about any prospective advantageous business transaction Kalejaiye could have had with QI's replacement.

that Kalejaiye could prove these elements of a claim for tortious interference with prospective business advantage, his claim fails, and the Court will grant QI summary judgment in this respect.

## V.  CONCLUSION

For the foregoing reasons, Quality Investigation, Inc.'s motion for summary judgment is **GRANTED** in part and **DENIED** in part, Abayomi Kalejaiye's motion for summary judgment is **DENIED**, and Abayomi Kalejaiye's motion for sanctions is **GRANTED** in part and **DENIED** in part.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 21, 2024                                   RUDOLPH CONTRERAS
                                                        United States District Judge